**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Christopher D. Phillips | ) | C/A No. 3:08-cv-03820-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION & ORDER** |
| v. | ) | **GRANTING  MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| James Joy, III, Michael Tempel, and | ) | |
| Robert W.  King, in their individual | ) | |
| capacities | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action Plaintiff, a state employee, challenges his job reassignment and related reprimand.  Plaintiff alleges that both events were in retaliation for speech protected under the First Amendment, as applied to states through the Due Process Clause of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).  Plaintiff also claims that his supervisors violated his First Amendment associational rights by prohibiting him from associating with co-workers, friends, and targets of an investigation in Lexington County.

This matter is now before the court on Defendants' motion for summary judgment, filed pursuant to Fed. R. Civ. P. 56.  Dkt.  No. 66.  For the reasons stated below, the court finds that three of the four statements on which Plaintiff relies as the basis for his retaliation claim are not subject to protection under the First Amendment.  As to the fourth statement, Plaintiff has presented no evidence of causation.  Plaintiff's freedom of association claim fails because the associations he has identified are not in the categories of intimate or expressive association protected under the First Amendment.  Defendants' motion for summary judgment is therefore granted in full.

**BACKGROUND**

From 2003 through late 2008, Plaintiff Christopher D. Phillips was an investigator in the Office of Criminal Investigations ("OCI") of the South Carolina Department of Health and Environmental Control ("DHEC"). For most of that time, Plaintiff's work garnered few complaints. However, in late 2007, OCI officials received one or more complaints regarding Plaintiff's demeanor when handling an asbestos dumping investigation in Lexington County ("the Swansea investigation").

Almost one year later, on July 2, 2008, Plaintiff raised several issues related to the conditions of his employment and then met with his immediate supervisor, Defendant Michael Tempel ("Tempel"), regarding those issues. On July 18, 2008, Defendant James Joy ("Joy") issued Plaintiff a written reprimand relating to Plaintiff's behavior during his meeting with Tempel and reassigned him from a law enforcement position in OCI to a non-law enforcement position in DHEC's Bureau of Land and Waste Management. Plaintiff continues to hold this non-law enforcement position today. *See* Dkt. No. 66-1 at 2; Dkt. No. 70 at 2. Plaintiff alleges that his July 2008 reprimand and reassignment were in retaliation for his speech or expressive conduct during the 2007 Swansea investigation. Plaintiff maintains that the reasons given by his superiors for his reprimand and reassignment were "fabricated and embellished." Dkt. No. 9 ¶ 14. Thus, the focus of Plaintiff's claims is the 2007 investigation.

**Swansea Investigation.** In early 2007 Plaintiff, Tempel (Chief of Criminal Investigations), and other OCI investigators began investigating allegations of illegal dumping of asbestos in Swansea. Dkt. No. 66-1 at 3-4. Plaintiff eventually became the primary investigator. *See* Dkt. No. 66-11 at 3 (Christopher Phillips Dep. at 27); Dkt. No. 70 at 2. In furtherance of the investigation, Plaintiff and other OCI personnel procured a search warrant from state magistrate Jamie Lucas.

2

Thereafter, in March 2007, Plaintiff and OCI officers executed the warrant by searching the property of Joe Phillips, one target of the Swansea investigation.

As execution of the warrant was taking place, Joe Phillips and his attorney came to the property. After their arrival, the attorney called Magistrate Lucas to complain about the manner in which DHEC was executing the warrant. Lucas responded to this complaint by first instructing Plaintiff to lock down the property to ensure that no evidence was compromised, and then directing Plaintiff and the attorney to come to his office to discuss the attorney's concerns. After Plaintiff challenged these instructions, Lucas directed Plaintiff to continue his search. Lucas informed Plaintiff that he would consider motions related to the search at a later date instead. Dkt. No. 66-15 at 2; Dkt. No. 71-5 at 3-4 (Lucas Dep. at 18-21). Although Lucas acquiesced to Plaintiff's request to complete execution of the warrant, he took issue with, *inter alia*, Plaintiff's "unprofessional manner." *Id.* at 10 (Lucas Dep. at 95-96).[1]

At some point after the search, Senator Jake Knotts contacted Magistrate Lucas and allegedly declared that he would "have [Plaintiff] fired when it was said and done." *Id.* at 6 (Lucas Dep. at 30). Senator Knotts also contacted DHEC Commissioner C. Earl Hunter to complain about Plaintiff's telephone conversation with Lucas and requested that Hunter contact Lucas regarding the encounter. When Hunter spoke with Lucas, the magistrate assured him that, after meeting with Plaintiff, the "issues were rectified." *Id.* at 10 (Lucas Dep. at 94).[2]

---

[1] At least one source of confusion between Plaintiff and Lucas was that Lucas initially spoke with *Joe* Phillips, whose property Plaintiff was searching, and was unaware that Plaintiff shared the same surname. *See* Dkt. No. 66-15 at 11 (Lucas Dep. at 77).

[2] After Plaintiff learned of this conversation between Hunter and Lucas during the discovery phase of this case, Plaintiff moved to file a Second Amended Complaint naming Hunter as a defendant. Dkt. No. 49. The court denied this motion because Plaintiff did not allege any facts in

In April 2007, Senator Knotts sought a meeting with Hunter and Joy (Assistant Deputy Commissioner of DHEC) to express his concerns about Plaintiff's investigation of the Swansea case. During this meeting, Knotts complained about Plaintiff's "cowboy attitude." Dkt. No. 66-12 at 12 (Joy Dep. at 89). Though Senator Knotts did not specifically request that Hunter and Joy terminate Plaintiff's employment, he "made a statement in a roundabout way" suggesting that investigators who use inappropriate tones in speaking with magistrates "should not be in law enforcement." Dkt. No. 66-1 at 5; Dkt. No. 66-13 at 17-19 (Hunter Dep. 122-24).

The record reflects no further discussion between any Defendant and Senator Knotts regarding Plaintiff. Joy did, however, follow up on Senator Knotts' questions regarding the Swansea investigation including by addressing OCI's use of protective suits and the questioning of Larry Yobs and Ronald Bailey, additional targets of the Swansea investigation (and originally defendants in this case.) Dkt. No. 66-1 at 5.

Plaintiff learned of Senator Knotts' complaints at some point between April and August 2007. On August 22, 2007, Plaintiff emailed Joy requesting a meeting to discuss the Senator's concerns. *Id.* at 6; Dkt. No. 66-4 at 2 (email from Plaintiff to Joy). Joy and Tempel had a lunch meeting with Plaintiff the following day. Though accounts of the meeting differ, all parties agree that the meeting focused on ways Plaintiff could be perceived more positively as he conducted his investigations. *See* Dkt. No. 71-1 at 9-11 (Christopher Phillips Dep. at 75-82); Dkt. No. 66-12 at 24-29 (Joy Dep. at 131-36); Dkt. No. 66-17 at 13 (Tempel Dep. at 127). It is unclear whether Plaintiff was officially removed from the Swansea investigation at the August 23, 2007 meeting.

the proposed amended complaint to show that Hunter was involved in the transfer decision or in any other alleged retaliatory actions. Dkt. No. 52; *see also* Dkt. No. 49-1 (proposed Second Amended Complaint).

*See* Dkt. No. 66-1 at 6-7 & n.1 (describing the confusion about whether Joy's statements at the August 23 meeting effectively removed Plaintiff from the Swansea investigation). No later than September 4, 2007, however, Plaintiff and Tempel agreed that Tempel would "take the lead on that case." Dkt. No. 66-5 at 2 (email exchange between Plaintiff and Tempel).[3]

**Subsequent Performance Review.** From September 2007, when Plaintiff was removed from the Swansea investigation, until July 2008, Plaintiff continued to conduct investigations for OCI. In his performance review for work between January 2007 and January 2008, Tempel gave Plaintiff an "outstanding" rating, the highest possible classification. In this review, which covered the period of Plaintiff's involvement in the Swansea investigation, Tempel described Plaintiff as "outstanding in his abilities as a criminal investigator" and praised his "thorough knowledge and understanding of the laws." Tempel also wrote that Plaintiff "has helped maintain the professional image of the OCI." Dkt. No. 66-6 at 3-5 (Tempel's evaluation of Plaintiff). Plaintiff also received a significant discretionary pay raise in April 2008 with approval from both Tempel and Joy. *See* Dkt. No. 66-1 at 7-8; Dkt. No. 66-7 (salary increase justification, signed by Tempel and Joy).

**July 2008 Meetings.** On July 1, 2008, Plaintiff emailed Tempel outlining questions and concerns about his conditions of employment, including Plaintiff's eligibility for on-call pay, his eligibility to serve on the Emergency Response Team, and other issues related to his duties and compensation. The following morning (July 2, 2008), Plaintiff met with Tempel and another OCI investigator, Richard Devors ("Devors") to discuss these issues. *See* Dkt. No. 66-8 at 2 (Tempel memo to Joy); Dkt. No 71-1 at 20 (Christopher Phillips Dep. at 131-32).

_____

[3] The Swansea investigation has now been turned over to the state Office of the Attorney General for prosecution.

5

Accounts of the July 2, 2008 meeting diverge. In his memo in opposition to the motion for summary judgment, Plaintiff describes the meeting is as follows:

> During the conversation, Plaintiff asked about the ERT and "on call" issues. At this point, Tempel became visibly irritated and started flailing his hands. Plaintiff stood up and excused himself out of his own office because he felt the conversation was getting out of control. Plaintiff walked around for a minute and then headed back towards his office. Plaintiff saw Tempel standing outside Devors' office, and asked Tempel if he could speak with him. Tempel and Plaintiff entered Tempel's office but did not shut the door. Once inside, Plaintiff told Tempel that "you are not doing anything to help me in my job." The conversation abruptly ended when Tempel told Plaintiff to "get the hell out," at which point Plaintiff left.

Dkt. No. 70 at 6.[4] Plaintiff alleges that Tempel "was just irrate [sic]." Dkt. No. 71-1 at 21 (Christopher Phillips Dep. at 134).

Although the court accepts Plaintiff's version of events as true for purposes of this motion, Tempel's contrasting recollection of the meeting is nonetheless relevant because it was shared with and considered by Joy in reprimanding Plaintiff for his actions in the meeting. Tempel testified that when he responded to Plaintiff's questions about the employment issues, Plaintiff "began getting angry about it." Dkt. No. 66-17 at 20 (Tempel Dep. at 157). According to Tempel, Plaintiff "elevated his voice, his tone changed, [and] he started using hand gestures . . . in what I believed was an inappropriate tone." *Id.* at 21 (Tempel Dep. at 158). Tempel claims that after further debate, Plaintiff mentioned that he might speak with Joy about the employment issues. Tempel testified that he felt Plaintiff "was pushing it," and that Plaintiff was "exploding." *Id.* at 22 (Tempel Dep. at 159). Tempel claims that Plaintiff directed Devors to leave the meeting, stating that he was "fixing to be insubordinate." *Id.* At that point, Tempel claims Plaintiff (rather than Devors) left the room.

---

[4] This summary is generally consistent with Plaintiff's testimony regarding the meeting. *See* Dkt. No. 71-1 at 20-21 (Christopher Phillips Dep. at 132-36).

Tempel testified that upon Plaintiff's return to the office, Plaintiff stated, "Okay, I'm ready to be insubordinate. I'll take what I get." *Id.* at 23 (Tempel Dep. at 160). At that point, Plaintiff allegedly "came at [Tempel] at a fast pace with his finger in [Tempel's] face" and accused Tempel of inaction using inappropriate language. *Id.*

Tempel sent a confidential memorandum to Joy on July 3, 2008 detailing his account of the meeting. Dkt. No. 70 at 6; *see also* Dkt. No. 66-8 (memo). Plaintiff subsequently requested a meeting with Joy, which did not occur until on or about July 16, 2008. Dkt. No. 70 at 6.

The record contains few details of Plaintiff's meeting with Joy. Plaintiff explains that he

> let [Joy] know that there were some issues about trust with a supervisor, Mr. Tempel. That Mr. Tempel was violating some policies. He was coming in late two or three times a . . . week; that I was covering for him a lot. He wasn't working any cases. . . . The cases that he would refer to, he would take credit for in the Criminal Review Committee . . . . He would hand off to me stuff to do that was way above and beyond my job description.

Dkt. No. 71-1 at 17 (Christopher Phillips Dep. at 119-20). Plaintiff also testified that he "let Mr. Joy know that the supervisor [Tempel] had made some decisions that were potentially, could be hazardous to the law enforcement officers, that there were some problems. . . . I specifically told him, 'You're not being told by the supervisor everything you need to know.'" *Id.*

On July 18, 2008, after consulting with Plaintiff, Tempel, Devors, and DHEC human resources staff, Joy issued Plaintiff a written reprimand via memorandum. The memorandum detailed Joy's findings regarding the conflict between Tempel and Plaintiff on July 2, 2008. Joy's memo informed Plaintiff that his conduct was "unacceptable, inappropriate and disruptive to our office setting." Dkt. No. 66-9 at 2. The memorandum also reassigned Plaintiff to a job title of Environmental Health Manager II and stated that although Plaintiff's job duties were still being developed, the agency anticipated that Plaintiff's duties would no longer include law enforcement.

Despite this change, the memorandum explained that Plaintiff's salary and classification would remain the same. *Id.* Plaintiff's reassignment became effective one month later, on August 18, 2008.

Although Plaintiff's salary and classification remain the same, he lost his eligibility to continue participating in South Carolina's Police Officers Retirement System ("PORS") because he no longer holds a law enforcement commission. However, Plaintiff did become eligible to participate in the South Carolina Retirement System ("SCRS"). Participation in SCRS also makes him eligible for the Teacher and Employee Retention Incentive ("TERI") retirement program. For purposes of this order, the court accepts that this change is a negative one.[5]

**Grievance.** In early September 2008, Plaintiff filed a grievance with Jon Fisher, Director of DHEC's human resources department. On September 12, 2008, Fisher denied the grievance. *See* Dkt. No. 66-1 at 11. On November 5, 2008, on appeal, State Human Resources Director Samuel Wilkins affirmed Fisher's denial of the grievance on the grounds that a reassignment without a change in pay or classification is not grievable or appealable under the State Employee Grievance Procedure Act. Dkt. No. 66-2 at 6. Plaintiff did not seek judicial review of the grievance decision. Dkt. No. 66-11 at 63 (Christopher Phillips Dep. at 197) (noting that he was unaware that judicial review of the grievance decision was available).

**Civil Action.** On November 19, 2008, Plaintiff initiated this action against DHEC, Joy, and Tempel, along with Robert W. King (Assistant Deputy Commissioner of DHEC) and Joseph Phillips, Larry Yobs, and Ronald Bailey (targets of the Swansea investigation). Dkt. No. 1. On

---

[5] PORS requires a shorter term of service than SCRS and pays a higher percentage annuity per year of service. Dkt. No. 9 at 3-4 (Am. Compl. ¶ 14).

December 4, 2008, Plaintiff filed an Amended Complaint against the same Defendants. In the Amended Complaint, Plaintiff alleged that Defendants King, Joy, and Tempel retaliated against him for exercising his First Amendment rights thus giving rise to a claim under 28 U.S.C. § 1983. Plaintiff also asserted two pendent state law claims: (1) a "public policy discharge" claim against DHEC and (2) a claim for intentional interference with contractual relations against Joe Phillips, Yobs, and Bailey. Dkt. No. 9.

On January 30, 2009, the court dismissed Defendants Joe Phillips, Yobs, and Bailey for lack of subject-matter jurisdiction. Dkt. No. 39; *see* Dkt. No. 16 (motion to dismiss). The court separately dismissed the public policy discharge cause of action for failure to state a claim. Dkt. No. 36. Thus, the only remaining cause of action is Plaintiff's Section 1983 First Amendment claim. On August 3, 2009, Plaintiff filed a motion for voluntary dismissal of this action, acknowledging potential flaws in his First Amendment claim and seeking dismissal without prejudice. Dkt. No. 62-1. The court denied Plaintiff's motion because the timing of the filing – the night before the deadline for dispositive motions – increased the potential for undue prejudice to Defendants. Dkt. No. 65. On August 19, 2009, Defendants moved for summary judgment. Dkt. No. 66.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## DISCUSSION

Viewing the evidence in the light most favorable to Plaintiff, the court concludes that Defendants are entitled to judgment as a matter of law for the reasons set forth below.

### I. First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against him for exercising his right to speak in the workplace on a matter of public interest, guaranteed by the First and Fourteenth Amendments to the United States Constitution. In order to make a *prima facie* case for such a claim, Plaintiff must establish four elements: (1) The speech must have been protected expression, meaning that it related to a matter of public concern and was beyond Plaintiff's official duties; (2) Plaintiff's interest in exercising his First Amendment expression right must outweigh Defendants' interest in an efficient workplace;[6] (3) Plaintiff must have been deprived of a valuable benefit or adversely affected in a way that would chill exercise of his First Amendment rights; (4) There must be a causal relationship

---

[6] This element is also known as the *Pickering* balancing test, derived from *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004).

between the protected expression and the deprivation or adverse employment decision at issue in the case. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-52 (4th Cir. 2000) (listing elements).[7] "[T]he first three elements are ultimately questions of law," while "[t]he fourth factor – one of causation – is one of fact." *Id.* at 352. If Plaintiff fails to establish any of these four elements, his claim fails.

**Protected Expression:** Plaintiff argues that he engaged in protected speech through four actions: (1) by proceeding with the Swansea investigation until September 2007 despite interference, (2) by sending a memorandum to Tempel on September 4, 2007 regarding the Swansea investigation,[8] (3) by meeting with Defendant Joy on or about July 16, 2008 prior to Joy's issuance

---

[7] Some of the Fourth Circuit's most recent First Amendment retaliation cases list three elements instead of four, omitting the third element of deprivation of a valuable benefit. *See, e.g.*, *Campbell v. Galloway*, 483 F.3d 258, 266-67 & n.4 (4th Cir. 2007); *Love-Lane*, 355 F.3d at 776. However, no Fourth Circuit or Supreme Court case law has established that this third element is an improper consideration in First Amendment retaliation analysis. This discrepancy likely exists because in the most recent cases, it was apparent that the plaintiff had been deprived of a valuable benefit – employment. Here, in contrast, this issue is in dispute as Defendants maintain Plaintiff's retention of salary and classification precludes a finding of such deprivation, while Plaintiff maintains that the change in retirement eligibility and loss of law enforcement commission are sufficient to establish an adverse employment action. *See* Dkt. No. 66-1 at 14 (citing *Goldstein* and listing four elements); Dkt. No. 70 at 9 (same). Because the court concludes that Plaintiff's claim fails on other grounds, it need not reach this element.

[8] The court assumes that the September 4, 2007 document is the email exchange between Plaintiff and Tempel which concluded that Plaintiff would no longer work on the Swansea investigation. In his deposition, Plaintiff makes reference to a memorandum to Tempel memorializing the August 23, 2007 lunch meeting. *See* Dkt. No. 71-1 at 14-16 (Christopher Phillips Dep. at 102-05). However, other than the email exchange, no September 2007 communication between Plaintiff and Tempel has been submitted to the court. Plaintiff labels both his purported September 4, 2007 memorandum to Tempel and his September 2, 2008 memo to Fisher as Plaintiff's Exhibit 9. *See* Dkt. No. 70 at 11-12; Dkt. No. 71-1 at 15 (Christopher Phillips Dep. at 102); Dkt. No. 72 at 5. In any event, all descriptions of the September 4, 2007 email, the September 2007 memorandum to Tempel, and the September 2, 2008 memorandum to Fisher confirm that the subject of these communications was limited to Plaintiff's personal employment concerns.

of the reprimand and reassignment, and (4) by sending a memorandum to Joe Fisher, DHEC's director of personnel, on September 2, 2008, challenging Joy's reprimand and initiating a grievance.[9]

Because "[p]rotection of the public interest in having debate on matters of public importance" is a fundamental First Amendment principle, the Amendment protects government employees from termination or demotion in retaliation for speaking on a matter of public interest. *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). For the First Amendment to insulate an employee from retaliation, the expression at issue must address a public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007) (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)). Employee statements that merely air "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" are not entitled to First Amendment protection. *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir. 1992).

As the Supreme Court has recently explained, the First Amendment does not shield public employees from the consequences of expressing themselves if their speech was undertaken as part of their official responsibilities. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *see also DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995) ("Because almost anything that occurs within a public agency *could* be of concern to the public, we

---

[9] The court notes that Plaintiff first mentioned the latter three instances in response to Defendants' motion for summary judgment. The Amended Complaint focuses only on the Swansea investigation. Dkt. No. 9 ¶¶ 8-13.

do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, *our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee*. In making this determination, *the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment*.") (first emphasis in original, second and third emphases added) (internal quotations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Campbell*, 483 F.3d at 267 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

The first, second, and fourth instances that Plaintiff identifies as "protected speech" – his participation in the Swansea investigation and both memoranda to his OCI superiors – plainly fall short of the legal standard set forth above. First, Plaintiff investigated the Swansea case pursuant to his official duties at OCI. OCI authorized Plaintiff to pursue the investigation until late August or early September 2007, at which point Plaintiff ceased participation in this investigation. *See* Dkt. No. 70 at 5-6. Accordingly, under *Garcetti*, Plaintiff's involvement in the Swansea investigation is plainly not protected by the First Amendment.[10] *See* 547 U.S. at 421.

---

[10] Plaintiff argues that all of his alleged instances of protected speech occurred outside his official job duties and that, accordingly, *Garcetti* does not apply. To support his argument, Plaintiff asserts that *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009), stands for the proposition that drafting an unrequested memorandum is beyond the bounds of an employee's official job duties. Plaintiff fails to note that the employee in *Andrew* claimed that *releasing the memo to a major newspaper*, in addition to authoring it, was beyond the scope of his official duties. *See id.* at 266. In addition, the district court in *Andrew* erroneously believed that the employee *conceded* that authoring and publicly releasing the memo was within the scope of his job duties. *Id.* at 266-67. The appellate court reasoned that, because of this error, it was more appropriate for the district court to rule on the case through summary judgment. *Id.* at 268. In any event, the *Garcetti* Court deliberately refrained from determining the scope of "official job duties" because all parties conceded that the employee expressed his views pursuant to his job duties. *See* 547 U.S. at 424 ("We . . . have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where

Likewise, Plaintiff's September 2007 memorandum to Tempel and his September 2008 memorandum to Fisher are not protected expression. Both communications concerned only Plaintiff's job duties and related personal interests. *See Stroman*, 981 F.2d at 156. Plaintiff's memorandum to Tempel, by Plaintiff's own admission, merely summarized the conversation between Tempel, Joy, and Plaintiff on August 23, 2007. Plaintiff's purpose in writing the memorandum was to "[memorialize] what had transpired" because he wanted to understand why he was being removed from the investigation. Dkt. No. 71-1 at 14-16 (Christopher Phillips Dep. at 99-104). Plaintiff has not identified any matter of public concern to which the September 4, 2007 email pertains. Similarly, Plaintiff's September 2, 2008 memorandum to Fisher, which was written *after* Plaintiff's reprimand and reassignment, "included a rebuttal to [Tempel's] reprimand as well as a grievance request." Dkt. No. 70 at 12. Plaintiff has not claimed that the memorandum contained any statement on any issue of public concern. *See id.* (discussing the contents of the 2008 memo).[11]

Plaintiff's most compelling argument that he engaged in protected speech focuses on the third alleged instance of protected speech: his meeting with Joy on or around July 16, 2008 following his July 2, 2008 meeting with Tempel. Plaintiff claims that he and Joy discussed, *inter alia*, Tempel's alleged management deficiencies, which Plaintiff claims could have been hazardous

_____

there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. The proper inquiry is a practical one.") (internal citation omitted). Nonetheless, for reasons stated elsewhere in this order, it is ultimately irrelevant whether Plaintiff's employment duties included engaging in such communications.

[11] Even if Plaintiff had alleged that his reassignment and reprimand were in retaliation for protected speech in the September 2008 Fisher memorandum, the court would have causation concerns because the alleged "protected speech" would have occurred *after* the alleged retaliatory action.

to law enforcement officials.  Dkt. No. 70 at 12.  The record contains no evidence as to the precise subject matter of these alleged safety-related statements.  Nonetheless, it is only this limited aspect of the July 16, 2008 meeting that has any possibility of protection under the First Amendment.

As the Fourth Circuit has explained, "almost anything that occurs within a public agency *could* be of concern to the public." *DiMeglio*, 45 F.3d at 805.  For this reason, the Fourth Circuit has recognized a First Amendment claim where the employee's expression "[s]eek[s] to bring to light actual or potential wrongdoing or breach of public trust." *Jurgensen v. Fairfax County*, 745 F.2d 868, 880 (4th Cir. 1984).  In a recent decision, the Fourth Circuit held that an employee's letter raised issues of public concern because, while it predominantly aired personal grievances, a "small portion" of the letter contained complaints about workplace sexual harassment.  *Campbell*, 483 F.3d at 267; *see also id.* at 269-70(detailing the employee's complaints and noting that, because they "involve[d] improper treatment of members of the public" as well as the employee and because the memo spoke "in much broader terms" about sexual harassment at this workplace, the plaintiff "was seeking to challenge the practice within the department as much as she was seeking a resolution of her own complaint.").  The *Campbell* court relied on the Supreme Court's 1983 decision in *Connick* and its own 1992 decision in *Stroman* to establish a fairly liberal test for whether a public employee's speech deals with a matter of public concern.  In *Connick*, the Court proceeded to the next step of the First Amendment retaliation test because "*one of the questions* in [plaintiff's] survey touched upon a matter of public concern, and contributed to her discharge . . . ."  483 F.3d at 267 (emphasis in original) (quoting 461 U.S. at 149).  Similarly, in *Stroman*, the court explained that it prefers to proceed to the *Pickering* balancing test "[w]hen speech arguably relates to a matter of public concern . . . ."  981 F.2d at 158.

The form and context of Plaintiff's alleged statements to Joy leave substantial uncertainty about the content and nature of Plaintiff's expression.[12]  Viewing the record in the light most favorable to Plaintiff, it is at least arguable that some aspect of Plaintiff's July 2008 meeting with Joy related to the publicly important issue of officer safety.  The court, therefore, assumes without deciding that Plaintiff's speech in the Joy meeting satisfies this prong because, even if protected, there is no proof of causation.

*Causation:*  Because the court finds it dispositive, the court next addresses whether Plaintiff's statements about law enforcement satisfy the causation element of the First Amendment retaliation claim.[13]  Notably, despite arguing that this speech is protected, Plaintiff has not argued that his comments about officer safety were a substantial factor in Joy's decision to reprimand and reassign Plaintiff to another position.  Plaintiff instead argues that the Swansea investigation caused the reassignment.  As explained above, the *Garcetti* rule precludes reliance on this "speech." Despite Plaintiff's failure to make a direct argument that his speech regarding officer safety caused his reassignment, the court has searched the record for evidence that these comments may have been causative of Plaintiff's reprimand and reassignment.

_____

[12] Plaintiff requested the meeting after Tempel sent a memorandum to Joy regarding the July 2, 2008 meeting.  Dkt. No. 70 at 6.  It was only after Tempel sent the memorandum about the meeting that Plaintiff "begged to meet with Joy."  *Id.*  Plaintiff proceeded to offer a litany of criticisms of Tempel's management style.  *Id.*  This context may suggest that the nature of the meeting and statements made were defensive of Plaintiff's employment position.  Nonetheless, for present purposes the court assumes that there is sufficient evidence to support the conclusion Plaintiff raised at least one matter of public concern during this meeting.

[13] Because the causation element is a question of fact, not a question of law, courts often proceed through all of the legal elements before proceeding to the causation element.  *See, e.g.*, *Goldstein*, 218 F.3d at 352.  However, in this case, it is more fitting to advance immediately to the causation inquiry because it is dispositive.  *See id.* ("The order of inquiry may vary with the circumstances of the case.") (quoting *Daniels v. Quinn*, 801 F.2d 687 (4th Cir. 1986)).

To prove causation, Plaintiff must show that "the protected speech was a 'substantial factor' in the decision to take the allegedly retaliatory action." *Goldstein*, 218 F.3d at 352 (quoting *McVey*, 157 F.3d at 277-78). The court must "review the record to determine whether a reasonable jury could conclude that [the plaintiff's] reassignment was 'substantially motivated by . . . protected speech; if a reasonable jury could reach this conclusion, then [the issue must be resolved through] trial.'" *Love-Lane*, 355 F.3d at 780 (quoting *Goldstein*, 218 F.3d at 357).

Plaintiff has not met his burden of producing evidence from which a reasonable jury could find that his statements regarding law enforcement safety were a substantial factor in Defendants' decision to reprimand and reassign him. In fact, prior to responding to Defendants' motion for summary judgment, Plaintiff never claimed that these statements were a reason for his reassignment. For example, in his Amended Complaint, Plaintiff alleges:

> On July 2, 2008, defendant Tempel fabricated and embellished a story about the plaintiff and Tempel along with defendants King and Joy issued the plaintiff a written reprimand. *Such constant harassing conduct by those defendants resulted in plaintiff being given a "lateral" transfer in August 2008 . . . .* Further, *due to this fabricated reprimand*, the plaintiff was removed from any effective investigative or police officer duties.

Dkt. No. 9 at 3-4 (Am. Compl. ¶ 14) (emphases added). Similarly, in response to Defendants' motion for summary judgment, Plaintiff makes the following causation argument which makes no references to the law enforcement safety issue:

> Plaintiff was removed from the "Swansea case" after legislative interference and told to not go into Lexington County because Senator Knotts was angry. Further, Plaintiff was no longer assigned cases in Lexington County. Between the time Plaintiff was removed from the case to the July 18, 2009 [sic] reprimand, Plaintiff felt like he was walking on eggshells. Plaintiff met with Tempel regarding some issues on July 2, 2008, yet *the minor incident was embellished and falsified such that Plaintiff was reprimanded and transferred*. All of these retaliatory events successively transpired and are causally related to Plaintiff's ultimate transfer. At a minimum, Plaintiff has shown that a genuine issue of material fact exists such that

Summary Judgment as to causation would be inappropriate.

Dkt. No. 70 at 16 (emphasis added).

In short, Plaintiff focused on the Swansea investigation and alleged overstatement of what occurred on July 2, 2008 as the causative factors, making no reference to his later alleged report of law enforcement safety issues. He has not argued, much less produced evidence, that his one instance of possibly protected speech regarding law enforcement safety in the mid-July meeting with Joy was a factor, much less a *substantial* factor, in his reassignment. Plaintiff argues instead that his investigation of the Swansea case drew ire from Defendants and others, leading them to single him out for "harassment" and ultimately led Tempel to fabricate and embellish a July 2, 2008 exchange between Plaintiff and Tempel. *See* Dkt. No. 70 at 16. None of these arguments rely on any claim that any of the Defendants retaliated due to Plaintiff's mid-July 2008 statements of concern regarding law enforcement safety. Accordingly, no reasonable jury could find that Plaintiff's arguably protected speech at the Joy meeting substantially motivated Plaintiff's reprimand and reassignment to a non-law enforcement position.

***Balancing Test and Deprivation of a Valuable Benefit:*** Because the court finds that Plaintiff's statements to Joy in July 2008 do not satisfy the causation prong of First Amendment retaliation analysis, the court need not determine whether Plaintiff's interests in expressing opinions about law enforcement safety outweigh Defendants' interests in maintaining an efficient workplace. Likewise, the court does not reach the question of whether Plaintiff's reassignment, loss of his law enforcement commission, and re-designation from the PORS retirement program to SCRS and TERI deprive him of a valuable benefit.

## II. First Amendment Association

Plaintiff also claims that Defendants violated his First Amendment right to associate with residents of Lexington County.[14] After Tempel notified Plaintiff of Senator Knotts' displeasure with his work, Plaintiff allegedly "feared to speak to anyone in Lexington much less associate with any of his friends there." Dkt. No. 70 at 11. Plaintiff and Devors claim that Plaintiff was "banned from a county by a legislator." *Id.*; *see also* Dkt. No. 71-6 at 4 (Devors Dep. at 59) ("Basically [Plaintiff] had been banned from Lexington County because of the complaint filed by Senator Knotts."). Plaintiff also testified in his deposition that Defendants abridged his right to associate with other DHEC staff involved in the Swansea investigation and with Joe Phillips, Yobs, and Bailey, the targets of the investigation, though this argument is omitted from his response in opposition to Defendants' motion for summary judgment. *See* Dkt. No. 66-11 at 58-59 (Christopher Phillips Dep. at 191-92). Plaintiff alleges not only that Defendants retaliated against his exercise of his work-related associational rights through his transfer, but also that Defendants violated his private associational rights by instilling fear of visiting friends in Lexington County.

Plaintiff's claims of violation of his associational rights are unavailing for both legal and factual reasons. First, the right to association clearly does not prevent an public employer from reassigning an employee as needed and does not compel a public employer to assign an employee to work in a specific geographic area. The relationship between co-workers and between an investigator and targets of an investigation are not of an intimate nature, nor are they protected as expressive association. Courts have defined the First Amendment freedom of association to include freedom of intimate association and freedom of expressive association. *Roberts v. United States*

---

[14] Although Plaintiff incorporates his entire association argument into his retaliation claim, the court addresses it separately.

*Jaycees*, 468 U.S. 609, 617-18 (1984). Intimate association "consists of the choice to 'enter into and maintain [an] intimate human relationship[],'" while expressive association has been defined as "the 'right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009) (quoting *Roberts*, 468 U.S. at 617-18). The relationship between Plaintiff and his co-workers is not the kind of association protected under the First Amendment.

Likewise, Plaintiff's assertion that he was afraid to visit friends in Lexington County is also unpersuasive. First, the Constitution does not recognize "a generalized right of 'social association.'" *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Second, the factual evidence does not support Plaintiff's claim that he was *actually* barred from social visits to Lexington County. In his deposition, Plaintiff testified that "it was a *joke* about that [I] couldn't go in Lexington County," suggesting that, to the extent Defendants told Plaintiff not to enter Lexington County, these comments may have been made in jest. Dkt. No. 72-3 at 16 (Christopher Phillips Dep. at 300) (emphasis added). In addition, Plaintiff's claim is undermined by the uncontradicted testimony of his witness, Devors, who admitted that he and Plaintiff had dinner at a restaurant in Lexington County after Plaintiff's supposed banishment. *See* Dkt. No. 72-4 at 4-5 (Devors Dep. at 133-34). Accordingly, Plaintiff's entire freedom of association claim fails.

## III. Qualified Immunity:

Defendants argue that, even if the court finds that their actions violated Plaintiff's First Amendment rights, they are entitled to qualified immunity. Dkt. No. 66-1 at 27-29. "Qualified immunity shields government officials performing discretionary functions from personal-capacity

liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Qualified immunity analysis has two steps: As a threshold, the court must determine whether the facts alleged, viewed in the light most favorable to the plaintiff, evince violation of a constitutional right. If the facts support this initial inquiry, the court must decide "whether the contours of the right were clearly established such that a reasonable official would understand that his actions violated that right." *Campbell*, 483 F.3d at 266. Because Plaintiff does not satisfy the threshold by showing a constitutional violation, the court need not proceed to the second step of qualified immunity analysis. Nonetheless, were the court to reach this inquiry it would not find the rights to be clearly established for reasons explained above.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **granted** in full.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 28, 2009